UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUANNA KNIGHTON., <br><br> Plaintiff, <br><br> v. <br><br> CEDARVILLE RANCHERIA of NORTHERN PAIUTE INDIANS, et al. <br><br> Defendants. | Case No. 16-cv-02438-WHO <br><br> **ORDER GRANTING MOTION TO DISMISS** <br><br> Re: Dkt. No. 10 |

## INTRODUCTION

Plaintiff Duanna Knighton, the former Tribal Administrator for defendant Cedarville Rancheria of Northern Paiute Indians ("the Tribe"), seeks declaratory and injunctive relief against the Tribe, Cedarville Rancheria Tribal Court ("Tribal Court"), and Tribal Court Judge Patricia R. Lenzi ("Tribal Judge Lenzi") (collectively "defendants") to avoid Tribal Court jurisdiction over claims that she defrauded the Tribe and breached her fiduciary duties to it.   Defendants move to dismiss Knighton's complaint because the Tribal Court has jurisdiction.  I agree that it has both regulatory and adjudicative authority over its former employee under the facts alleged; accordingly, it has subject matter jurisdiction.  Defendants' motion is GRANTED WITH PREJUDICE.

# BACKGROUND

## I.  FACTUAL BACKGROUND[1]

### A.  The Cedarville Rancheria Tribe

Cedarville Rancheria of Northern Paiute Indians ("the Tribe") is a federally recognized Indian tribe located in Medoc County, California. *Id*. ¶ 2; Duran Decl. ¶ 3 (Dkt. No. 10-2). It has approximately 12 voting members[2] and operates a 17-acre Rancheria in Cedarville, California. Compl. ¶ 2; Tribal Court Compl. ¶1 (Dkt. No. 1-3 at 2). The Rancheria land is held in trust for the Tribe by the United States government; it contains tribal housing, a recreation center, travel center, convenience store, and gas station. Duran Decl. ¶ 3. The Tribe's headquarters building is located approximately 30 miles west of the Rancheria in Alturas, California, on land owned in fee by the Tribe.[3]  Compl. ¶ 2; Duran Decl. ¶ 4.

In February 2011, the Tribe's voting membership adopted by election the Constitution and Bylaws of the Cedarville Rancheria, which was approved in March 2011 by the Regional Director

---

[1] The following facts are alleged in Knighton's complaint and attached exhibits (Dkt. No. 1), defendants' motion to dismiss (Dkt. No. 10), Knighton's opposition (Dkt. No. 14), and defendants' reply (Dkt. No. 15). Knighton attached the following exhibits to her complaint: (1) Cedarville Rancheria Judicial Code, *see* Compl. ¶ 15; Ex. 1 (Dkt. No. 1-2 at 1); (2) Cedarville Rancheria Policies, *see* Compl. ¶ 18; Ex. 2 (Dkt. No. 1-2 at 19); (3) Cedarville Rancheria Constitution and Bylaws, *see* Compl. ¶ 24; Ex. 3 (Dkt. No. 1-2 at 42); (4) Tribal Court Complaint, *see* Compl. ¶ 27; Ex. 4 (Dkt. No. 1-3 at 1); (5) Tribal Court Order regarding TRO and Injunction, *see* Compl. ¶ 31; Ex. 5 (Dkt. No. 1-3 at 19); (6) Tribal Court Order Denying Knighton's Motion to Dismiss, *see* Compl. ¶ 32; Ex. 6 (Dkt. No. 1-3 at 23); (7) Stipulation Regarding Temporary Stay, *see* Compl. ¶ 33; Ex. 7 (Dkt. No. 1-3 at 32); (8) Tribal Court Order Granting Temporary Stay, *see* Compl. ¶ 34; Ex. 8 (Dkt. No. 1-3 at 39); (9) Tribal Court Order Granting RISE's Motion to Dismiss, *see* Compl. ¶ 35; Ex. 9 (Dkt. No. 1-3 at 41); (10) Tribal Court of Appeals Order Regarding Knighton's Motion to Dismiss, *see* Compl. ¶ 36; Ex. 10 (Dkt. No. 1-3 at 51); (11) Tribal Court Order Denying Knighton's Motion to Dismiss Under Rule 19, *see* Compl. ¶ 37, Ex. 11 (Dkt. No. 1-3 at 58); (12) Stay and Stipulation Vacating the Appeal, *see* Compl. ¶ 38, Ex. 12 (Dkt. No. 1-3 at 64); (13) Cedarville Rancheria's Complaint in an unrelated action, *see* Compl. ¶ 60; Ex. 13 (Dkt. No. 1-3 at 68). Citations to exhibits attached to Knighton's complaint are to page numbers corresponding to the ECF docket number.

[2] This figure was extracted from the Tribe's complaint against Knighton, filed in October 2014. Tribal Court Compl. ¶ 1 (Dkt. No. 1-3 at 2).

[3] The Tribe is currently "in the process of seeking fee-to-trust status of the land on which the Tribal headquarters sit." Tribal Court Order Denying Knighton's Motion to Dismiss Under Rule 19 ¶ 7 (Dkt. No. 1-3 at 61). The Tribal Court Order, dated June 29, 2016, indicates that "[t]his process will conclude within the next 20 months, at most, and may conclude within 14 months of the date of this hearing." *Id*.

of the United States Department of the Interior, Bureau of Indian Affairs. Compl. ¶ 24; *see* Cedarville Rancheria Constitution and Bylaws (Dkt. No. 1-2 at 43). Article II of the Tribe's constitution provides that the "jurisdiction of [the Tribe] shall extend to the land now within the confines of the Cedarville Rancheria and to such other lands as may hereafter be added thereto." Cedarville Rancheria Constitution and Bylaws (Dkt. No. 1-2 at 45).

The Tribe's governing body is the Community Council composed of all qualified voters of the Rancheria who are 18 years of age or older. *Id.* (Dkt. No. 1-2 at 46). Every three years the Community Council elects three of its members to serve on the Executive Committee—the Tribal Chairperson, Vice Chairperson, and Secretary. *Id*. (Dkt. No. 1-2 at 46-47). The Executive Committee is empowered to enforce the Community Council's ordinances, resolutions, and other enactments, and represents the Tribe in all negotiations with tribal, federal, state, and local governments. *Id*. The Tribal Chairperson functions as the "chief executive officer" of the Tribe, oversees all Rancheria matters including signing checks on behalf of the Tribe for tribal expenses, and is the "authorized point-of-contact, along with the Tribal Secretary or Tribal Administrator, to sign Tribal documentation, including grant applications, MOUs [memoranda of understanding], supply orders, trip requests, etc." *Id*. (Dkt. No. 1-2 at 50).

### B. Plaintiff Duanna Knighton's Employment with the Tribe

Duanna Knighton is a non-Indian California resident who was employed by the Tribe from July 1996 until she resigned in March 2013. Compl. ¶¶ 1, 9. She is not a member of the Tribe and has never resided on nor owned tribal land. *Id*. ¶¶ 10–11. The Tribe hired her in 1996 as a part-time office assistant. Tribal Compl. ¶ 10 (Dkt. No. 1-3 at 4). In 1999, she became a salaried tribal employee eligible for employment benefits, and she was later promoted to Tribal Administrator—the position she held at the time of her resignation. Compl. ¶ 9; Tribal Compl. ¶¶ 13–15 (Dkt. No. 1-3 at 4). As Tribal Administrator, Knighton was "responsible for over-all supervision and management of the Cedarville Rancheria," and oversaw the Tribe's "payroll, taxes, and expenses, financial statements/reports for audit, expenditures, and ledgers under direct supervision of the Chairperson." Compl. ¶ 18; Cedarville Rancheria Constitution and Bylaws (Dkt. No. 1-2 at 26).

From 2009 until at least October 2016, Knighton was also employed by Resources for

Indian Student Education ("RISE"), a California nonprofit that provides education services and programs to Indian children.[4] Compl. ¶ 14; Tribal Court Order Granting RISE Mot. to Dismiss (Dkt. No. 1-3 at 43). RISE is not a tribally-created or licensed business entity; it receives the majority of its funding from state and federal grants and private donations. Tribal Court Compl. ¶ 3 (Dkt. No. 1-3 at 3), Tribal Court Order Granting RISE Mot. to Dismiss (Dkt. No. 1-3 at 43).

During Knighton's employment, the Tribe regulated its employees pursuant to the Cedarville Rancheria Personnel Policies and Procedures Manual ("Personnel Manual"). It set forth disciplinary and grievance procedures for tribal employees prior to the creation of the Tribal Court, which will be discussed later. Compl. ¶¶ 18–23. Under the Personnel Manual—which Knighton helped develop when she was Tribal Administrator—all tribal employees subjected to disciplinary action were entitled to file a grievance with the Tribal Administrator and could appeal certain disciplinary actions after exhausting available administrative remedies. *Id*. ¶¶ 20–23; Personnel Manual (Dkt. Nos. 1-2 at 26, 39). Where the Tribal Administrator was the subject of disciplinary action, the Tribal Council, composed of the Tribe's adult voting membership, directly oversaw the disciplinary and grievance procedures. Personnel Manual (Dkt. No. 1-2 at 40). Appeal hearings were subject to the control of the Tribal Council, and were "presided over as other council meetings and the general format [would] be followed unless the council decide[d] [t]o vary the procedure." *Id*. (Dkt. No. 1-2 at 40–41). The Tribal Council's decision following an appeal hearing was final. *Id*.

### C. The Tribe's Purchase of the RISE Property

In mid-2009,[5] Knighton recommended that the Tribe purchase from RISE an administrative building located in Alturas, California, for a "below market rate" of $350,000. *Id*. ¶¶ 29–30; Tribal Court Compl. ¶ 18 (Dkt. No. 1-3 at 5–6). Acting in her capacity as Tribal

---

[4] Presumably, Knighton is no longer employed by RISE, as the parties' January 17, 2017 joint case management statement refers to RISE as Knighton's "former employer." Case Management Statement (Dkt. No. 12 at 3).

[5] During this time, former Tribal Chairperson Cherie Lash Rhoades supervised Knighton's activities as Tribal Administrator. Compl. ¶ 26. *See infra* section I.F.

Administrator, Knighton negotiated the purchase on behalf of the Tribe. Tribal Court Compl. ¶ 49 (Dkt. No. 1-3 at 12). She represented that the loan could be paid off within 5 years, that RISE would remain a tenant in the building and that the Tribe could use that rental income to pay off the mortgage. *Id*. ¶¶ 49–50 (Dkt. No. 1-3 at 12). In June 2009, the Tribe—relying on Knighton's representations—submitted a counter-offer of $300,000, which RISE accepted.[6] *Id*. The property currently serves as the tribal headquarters, and the title to the building and land is owned in fee by the Tribe.[7] Tribal Court Order Granting RISE Mot. to Dismiss (Dkt. No. 1-3 at 44).

Within 12 months of the sale, RISE moved its business operations out of the building, contrary to Knighton's representation that it would remain a rent-paying tenant. Tribal Court Compl. ¶¶ 18, 49 (Dkt. No. 1-3 at 6, 12). At the time of the purchase, Knighton failed to disclose to the Tribe that: (1) she was an officer or agent of RISE; (2) RISE was close to insolvency; (3) she and RISE would split the proceeds of the sale after paying off the building loan; and (4) the building's actual market value was $150,000, not $300,000. Tribal Court Compl. ¶¶ 49–55 (Dkt. No. 1-3 at 12). The Tribe did not learn about her conflict of interest and other omissions regarding the purchase of the RISE building until after she resigned in March 2013. Tribal Court Compl. ¶ 19 (Dkt. No. 1-3 at 6).

### D. Knighton's Resignation

In March 2013, Knighton resigned from her position as Tribal Administrator. Compl. ¶ 9; Tribal Court Compl. ¶ 19 (Dkt. No. 1-3 at 6). Immediately before she resigned, Knighton cashed-out $29,925[8] in vacation and sick pay[9] in violation of the Tribe's policies and procedures. Tribal Court Compl. ¶ 20 (Dkt. No. 1-3 at 6). The Tribal Vice Chairperson signed off on Knighton's

---

[6] The Tribal Court noted that there is no document in existence that sets forth the terms of the sale between RISE and the Tribe for the building. Tribal Court Order Granting RISE's Mot. to Dismiss (Dkt. No. 1-3 at 44).

[7] *See supra* note 3.

[8] The Tribe's complaint lists the amount as $29,995, *see* Tribal Court Compl. ¶ 22, but the attached exhibit states $29,925, *see* Tribal Court Compl., Ex. A.

[9] Exhibit A attached to the Tribe's complaint says this was for sick pay, not vacation pay, but the complaint alleges vacation pay. Tribal Court Compl. ¶ 20.

request to cash out based on her representation that Tribal Chairperson Cherie Lash Rhoades had approved it. *Id*. The Tribe issued a check in the amount of $29,925, payable to RISE on Knighton's behalf. *Id*. In late 2013, upon learning that Knighton had inflated her vacation and sick pay, the Tribe sent a letter to her and RISE demanding the return of the $29,925 improperly paid to her—both RISE and Knighton declined through their counsel to return the funds. *Id*. ¶ 22.

### E. Creation of Tribal Judicial Code and Tribal Court

In December 2013, nine months after Knighton's resignation, the Tribe enacted the Cedarville Rancheria Judicial Code and established the Cedarville Rancheria Tribal Court ("Tribal Court"). Compl. ¶¶ 15–16. The Tribal Court, including a trial and appellate division, was created "for the purpose of protecting and promoting tribal sovereignty, strengthening tribal self-government, [and] providing for the judicial needs of the Cedarville Rancheria." Cedarville Rancheria Judicial Code (Dkt. No. 1-2 at 2). Tribal Court proceedings are governed by the Federal Rules of Civil Procedure and Rules of Evidence, and the court can apply tribal, federal, and state laws, issue orders and judgments, and award monetary damages and injunctive relief. Compl. ¶ 25; Cedarville Rancheria Judicial Code (Dkt. No. 1-2 at 15).

Pursuant to Section 201 of the Tribe's Judicial Code, the Tribal Court has subject matter jurisdiction over "[a]ll persons outside the exterior boundaries of the Cedarville Rancheria Reservation … within the jurisdiction of the Rancheria pursuant to federal or tribal law, including all persons whose activity on or off reservation threatens the Rancheria, government or its membership," and to "[a]ll other persons whose actions involve or affect the Rancheria, or its members, through commercial dealings, contracts, leases or other arrangements." Cedarville Rancheria Judicial Code (Dkt. No. 1-2 at 3–4). The Code further provides that the Tribal Court's judicial power extends to "[a]ll civil causes of action arising at common law including, without limitation, all contract claims (whether the contract at issue is written or oral or existing at law), all tort claims (regardless of the nature), all property claims (regardless of the nature), all insurance claims, and all claims based on commercial dealing with the Band, its agencies, sub-entities, and corporations chartered pursuant to its laws, and all nuisance claims." Cedarville Rancheria Judicial Code (Dkt. No. 1-2 at 4).

### F. Cedarville Shooting

On February 20, 2014, during the first hearing in the first case before the Tribal Court, former Tribal Chairperson Cherie Lash Rhoades (Knighton's former boss) opened fire and killed four Tribe members. Compl. ¶ 26; Tribal Court Compl. ¶ 23 (Dkt. No. 1-3 at 7). Rhoades and the victims were all linked to the underlying dispute between Knighton and the Tribe. Compl. ¶ 26. Among those murdered were the Tribal Administrator and Rhoades' brother, who was Tribal Chairman and an outspoken critic of Knighton's handling of the Tribe's finances. Tribal Court Compl. ¶ 23 (Dkt. No. 1-3 at 7).

In the aftermath of this tragic shooting, the Tribe conducted a forensic accounting of its finances. Tribal Court Compl. ¶ 24 (Dkt. No. 1-3 at 7). The investigation revealed that during Knighton's tribal employment, she made various unauthorized high-risk investment decisions on behalf of the Tribe, which resulted in the loss of $1.2 million in tribal investments between 2007 and 2008. Tribal Court Compl. ¶¶ 16–17 (Dkt. No. 1-3 at 5). The Tribe was unaware of its high risk investment portfolio and $1.2 million in investment losses because Knighton concealed the annual audit reports and investment documents from the Tribe during her employment. Tribal Court Compl. ¶¶ 17, 24, 39–41 (Dkt. No. 1-3 at 5, 7, 9–10). The Tribe also discovered that Knighton opened a tribally funded trust without authorization, fraudulently inflated her salary and benefits, and manipulated the Tribe's policies to provide herself fringe benefits, including a pension and excess sick and vacation days. Tribal Court Compl. ¶ 26–31 (Dkt. No. 1-3 at 7–8). After discovering Knighton's mismanagement of tribal finances and unauthorized investments, the Tribe filed suit against her in Tribal Court.

## II. PROCEDURAL BACKGROUND

### A. The Underlying Tribal Court Action

On September 25, 2014,[10] the Tribe lodged a complaint in Tribal Court against Knighton, RISE, and Oppenheimer Funds, Inc.[11] Compl. ¶¶ 27, 29–30; *see* Tribal Court Compl. (Dkt. No. 1-

---

[10] The complaint is dated September 25, 2014, but stamped as filed on October 2, 2014.

[11] Oppenheimer Funds, Inc. is a New York based financial fund manager that held funds at issue in this matter, on deposit from the Tribe for the benefit of Knighton. Tribal Court Compl. ¶ 4 (Dkt. No. 1-3 at 3).

3 at 1–18).[12] The Tribe's complaint asserts eight claims against Knighton: (1) fraud and deceit; (2) recovery of unauthorized and excessive pension payments; (3) recovery of unauthorized investment losses; (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; (6) unjust enrichment; (7) common count-account stated; and (8) common count-money had and received. *Id*. Claims five through eight are brought against Knighton and RISE. Compl. ¶ 30.

On October 1, 2014, the Tribal Court issued a temporary restraining order against Knighton, RISE, and Oppenheimer, freezing all funds on deposit with Oppenheimer held in Knighton's name. *Id*. ¶ 31; Compl. Ex. 5, Tribal Court Order Re TRO (Dkt. No. 1-3 at 20).

On October 28, 2014, Knighton filed a Rule 12(b)(6) motion to dismiss the complaint, and the Tribal Court heard argument on January 8, 2015. Compl. ¶ 32. The Tribal Court, Chief Judge Lenzi presiding, ruled that it had authority to adjudicate the case and denied Knighton's motion to dismiss on March 11, 2015. *Id*. ¶ 32; Compl. Ex. 6, Tribal Court Order Denying Knighton's Mot. to Dismiss (Dkt. No. 1-3 at 24). On February 24, 2015, RISE filed a separate Rule 12(b)(2) motion challenging the Tribal Court's jurisdiction. Compl. Ex. 9, Order Granting Mot. to Dismiss as to RISE (Dkt. No. 1-3 at 42). On April 21, 2015, the parties[13] stipulated to stay the action against Knighton pending a ruling on RISE's motion to dismiss. Compl. ¶¶ 33–34. The Tribal Court granted the stay on April 23, 2015, and noted that its jurisdictional ruling was not ripe for federal review but was ripe for review in the Cedarville Rancheria Court of Appeals ("Tribal Court of Appeals"). *Id*. ¶ 34; Order Granting Temporary Stay ¶¶ 1–2 (Dkt. No. 1-3 at 40). On June 30, 2015, the Tribal Court granted RISE's motion to dismiss for lack of personal jurisdiction. Compl. ¶ 35; Order Granting Mot. to Dismiss as to RISE (Dkt. No. 1-3 at 42).

Knighton filed a notice of appeal on July 20, 2015, asserting that the Tribal Court lacks jurisdiction over her, and that the tribal complaint must be dismissed because RISE is an

---

[12] The underlying tribal court action is titled *Cedarville Rancheria of Northern Paiute Indians v. Duanna Knighton, et al.*, Case No. CED-CI-2014-00002. Compl. Ex. 4, Tribal Court Compl. (Dkt. No. 1-3 at 1).

[13] The Tribal Court dismissed Oppenheimer from the action sometime before April 21, 2015. Stipulation Regarding Temporary Stay (Dkt. No. 1-3 at 33).

8

indispensable party whose joinder is not feasible. Compl. ¶ 36. On March 7, 2016, the Tribal Court of Appeals affirmed the Tribal Court's denial of Knighton's motion to dismiss but remanded the issue of whether RISE was an indispensable party—raised for the first time on appeal—to the Tribal Court to develop the factual record and make the necessary findings. *Id*.; Tribal Court of Appeals Order Regarding Knighton's Motion to Dismiss (Dkt. No. 1-3 at 52). Knighton subsequently filed a motion to dismiss under Rule 12(b)(7) for failure to join indispensable party RISE under Rule 19. Compl. ¶ 37. The Tribal Court heard argument on June 13, 2016, and denied the motion in its entirety on June 29, 2016. *Id*.; Tribal Court Order Denying Knighton's Motion to Dismiss Under Rule 19 (Dkt. No. 1-3 at 59). Knighton appealed the decision to the Tribal Court of Appeals. Compl. ¶ 38. On September 26, 2016, pursuant to a stipulation between the parties, the Tribal Court vacated the appeal and stayed the case to allow Knighton to challenge the Tribal Court's jurisdiction over her in federal court. Compl. ¶ 38.

### B.     The Present Action

On October 12, 2016, Knighton filed this action against the Tribe, Tribal Court, and Tribal Judge Lenzi.[14] Knighton seeks (1) a declaratory judgment that the Tribal Court lacks jurisdiction over her, (2) a declaration that RISE is an indispensable party to the tribal action and therefore she must be dismissed from the suit, and (3) a permanent injunction against further proceedings in Tribal Court. Compl. ¶¶ 67–69.

On December 16, 2016, defendants moved to dismiss Knighton's complaint pursuant to Rule 12(b)(1) and (6), on the following grounds: (1) the complaint fails to establish federal subject matter jurisdiction; (2) the Tribal Court has jurisdiction over Knighton under *Montana v. United States*, 540 U.S. 544 (1981); (3) sovereign immunity shields defendants from suit; (4) Knighton's complaint fails to state a claim upon which relief can be granted; (5) defendants are not necessary parties to federal review of Tribal Court jurisdiction; and (6) this case will never be ripe for federal review. Mot. (Dkt. No. 10).

---

[14] Defendant Patricia R. Lenzi is chief judge of the Tribal Court, and she is included in Knighton's suit in her official capacity only. Compl. ¶¶ 4, 6.

9

**DISCUSSION**

"[A] federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction" over a nonmember. *Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 852-53 (1985). "Non-Indians may bring a federal common law cause of action under 28 U.S.C. § 1331 to challenge tribal court jurisdiction." *Boozer v. Wilder*, 381 F.3d 931, 934 (9th Cir. 2004). However, as a matter of comity, a plaintiff must first exhaust tribal court remedies before seeking relief in federal court.[15] *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008). "At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 17 (1987). Because Knighton is non-Indian and it is undisputed that she has exhausted her tribal remedies with respect to the question of tribal jurisdiction over her, subject matter jurisdiction exists pursuant to § 1331.[16]

## I. TRIBAL JURISDICTION

"Tribes maintain considerable authority over the conduct of both tribal members and nonmembers on Indian land, or land held in trust for a tribe by the United States." *McDonald v. Means*, 309 F.3d 530, 536 (9th Cir. 2002). "To exercise its inherent civil authority over a [nonmember] defendant, a tribal court must have both subject matter jurisdiction—consisting of regulatory and adjudicative jurisdiction—and personal jurisdiction." *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 809 (9th Cir. 2011). A tribe's regulatory authority concerns its power to regulate nonmember conduct while adjudicative authority relates

---

[15] The Supreme Court recognizes four exceptions to the exhaustion rule: "(1) when an assertion of tribal court jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) when the tribal court action is patently violative of express jurisdictional prohibitions; (3) when exhaustion would be futile because of the lack of an adequate opportunity to challenge the tribal court's jurisdiction; and (4) when it is plain that tribal court jurisdiction is lacking, so that the exhaustion requirement would serve no purpose other than delay." *Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 847 (9th Cir. 2009) (internal quotation marks, citations, and modifications omitted). Because the parties agree that Knighton has exhausted tribal remedies with respect to her jurisdictional challenge, I do not consider whether these exceptions apply.

[16] In reviewing the Tribal Court's ruling on jurisdiction "the district court's review is akin to appellate review of the tribal court record." *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 817 n.9 (9th Cir. 2011) (citation omitted).

to the tribal court's jurisdictional power to adjudicate certain disputes. *See Strate v. A-1 Contractors*, 520 U.S. 438, 442 (1997). The Supreme Court has made clear, however, that a tribe's adjudicative authority over nonmembers is confined by the bounds of its regulatory authority. *Id*.

### A. Subject Matter Jurisdiction

*Montana v. United States* is "the pathmarking case concerning tribal civil authority over nonmembers." *Strate*, 520 U.S. at 445. The *Montana* Court announced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe[,]" while simultaneously recognizing that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Montana v. United States*, 450 U.S. 544, 565 (1981). The Court identified two circumstances, known as the *Montana* exceptions, in which the exercise of jurisdiction over a non-Indian might be appropriate. *Id*. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id*. And second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id*. at 566.

In the Ninth Circuit, *Montana*'s exceptions "do[] not apply to jurisdictional questions" over nonmembers for claims arising on tribal land within a reservation, except "where a state has a competing interest in executing a warrant for an off-reservation crime." *Water Wheel*, 642 F.3d at 813 (citing *Nevada v. Hicks*, 533 U.S. 353 (2001)).[17] In *Water Wheel*, the Ninth Circuit explained

---

[17] In *Nevada v. Hicks*, the Court held that a state's considerable interest in executing criminal warrants for off-reservation crimes outweighed the tribe's authority to regulate the on-reservation activities of state officers, and thus *Montana* applied. 533 U.S. 353 (2001). The *Water Wheel* court acknowledged *Hicks*, but determined it "is best understood as the narrow decision it explicitly claims to be[,]" concluding, for jurisdictional questions arising on Indian land, *Montana* "appl[ies] only when the specific concerns at issue in [*Hicks*] exist." *Water Wheel*, 642 F.3d at 813. The *Water Wheel* court arrived at this conclusion, even though *Hicks* found that *Montana*'s reasoning "clearly impl[ies] that the general rule of *Montana* applies to both Indian and non-Indian land." *Hicks*, 533 U.S. at 360. In this vein, other circuits have recognized *Water Wheel*'s seeming divergence from Supreme Court precedent. *See, e.g.*, *Stifel, Nicolaus & Co. v. Lac du Flambeau*

11

that applying *Montana* to cases arising on reservation trust land "would impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government." *Id*. The threshold question then, is whether it is even necessary to apply *Montana*'s exceptions to this case.

### 1. Applicability of *Montana*

Both parties focused exclusively on *Montana*, while neither party addressed *Water Wheel*'s explicit direction not to apply *Montana* to jurisdictional questions over nonmembers for claims arising on Indian land. Neither party argues that Knighton's activities occurred on non-Indian fee land within the reservation, which would justify *Montana*'s application. Rather, the parties acknowledge that the conduct at issue occurred on trust land within the reservation and at the tribal headquarters building,[18] which is currently undergoing a process of fee-to-trust conversion. Tribal Court Order Denying Knighton's Motion to Dismiss Under Rule 19 ¶ 7 (Dkt. No. 1-3 at 61).

---

*Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 214 (7th Cir. 2015)("We do not believe that [*Water Wheel*'s] conclusions can be reconciled with the language that the Court employed in *Hicks* and *Plains Commerce Bank*."). Another district court in this circuit recognized this deviation, and invoked the Supremacy Clause to apply Montana on Indian land, notwithstanding *Water Wheel*'s instruction to the contrary. *Rolling Frito–Lay Sales LP v. Stover,* 2012 WL 252938, at *3 (D. Ariz. 2012) ("To the extent that the *per curiam* opinion in *Water Wheel* departs from Supreme Court jurisprudence in the area of Federal Indian Law, we are constrained by the Supremacy Clause, Art. VI, and Article III ('one supreme Court') to follow the Supreme Court. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 535, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983). We thus apply *Montana* to this case.") Another court avoided the analysis altogether. *See Salt River Project Agr. Imp. & Power Dist. v. Lee*, 2013 WL 321884, at *12 (D. Ariz. 2013)(deciding that issue of whether *Montana* applies is irrelevant because the result would be the same whether foregoing application of *Montana* or applying it and finding an exception applies—the tribe would have the sovereign authority to regulate employment). While my conclusion is the same as the court in *Salt River*, I address this issue because it was important to the parties' arguments and the Tribal Court's determination.

[18] The headquarters is located outside of the reservation, where the Tribe lacks the authority to regulate a non-Indian. *Water Wheel*, 642 F.3d at 815. While the underlying complaint does not allege precisely where the conduct at issue occurred, Knighton must concede that all pre-2009 conduct occurred on the reservation. This pre-2009 conduct underlies many of the claims in the Tribal Court Complaint, including unjustified salary increases, unwarranted fringe benefits, unauthorized investment losses, and various misrepresentations and omissions. *See* Tribal Court Compl. (Dkt. No. 1-3). Even post-2009 conduct that *may* have taken place off of the reservation is undoubtedly related to tribal land. *See Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1132 (9th Cir. 2006)("[W]hether tribal courts may exercise jurisdiction over a nonmember defendant may turn on how the claims are related to tribal lands.") Accordingly, I find the location of the Tribal headquarters building immaterial to an analysis of subject matter jurisdiction.

Accordingly, under Ninth Circuit precedent, *Montana* does not apply at all. *Water Wheel*, 642 F.3d at 812 (collecting cases confirming that *Montana* does not apply to a Tribe's jurisdiction over non-Indians on Indian land).

The Tribal Court and Tribal Court of Appeals, however, proceeded to apply *Montana* and determined that subject matter jurisdiction exists under both *Montana* exceptions, as Knighton had a longstanding consensual employment relationship with the Tribe and her activities in question directly harmed the Tribe's economic security. Tribal Court of Appeals Order Re Knighton's Mot. to Dismiss (Dkt. No. 1-3 at 55). In reaching this conclusion, the Tribal Court of Appeals relied on the lower court's factual findings that "[s]ome of [ ] Knighton's duties and actions at issue in this case were carried out on the [Tribe's] trust lands," and "some were carried out at the fee-owned tribal headquarters building of the tribe in the town of Alturas, CA, and not on trust lands of the tribe." *Id*. The Tribal Court also noted that "some of [Knighton's] duties carried out at Tribal Headquarters in Alturas involved actions and effects on the Tribal trust lands in Cedarville." *Id*.

In regards to RISE, the Tribal Court described the ownership status of the lands at issue and presented a detailed analysis of why the Tribe does not have jurisdiction under *Montana*:

> It is undisputed that the Cedarville Rancheria Tribal Building is not on land held in trust for the benefit of the Tribe. Therefore it is not "Indian country" over which the Tribe can exercise civil jurisdiction under [§] 18 USC 1551. Since Congress has not ratified the Cedarville Rancheria's Constitution, the Tribal Administrative Building and the land on which it sits is not only *not* in Indian country, the building is also not "*fee lands within its reservation*" under *Bugenig* or *Montana*. The initial assumption under *Montana* is that a tribe may exercise jurisdiction over a non-Indian on fee lands within the tribe's reservation – the lands in question must be located within a reservation's boundaries. Therefore, the federal standard set forth in *Montana* for exercising jurisdiction over a non-Indian has not been met because under federal legal analysis, the [RISE] building and the land it sits on do not meet any federal definition of reservation lands. The two prongs of the *Montana* test cannot even be reached for application until the [Tribal] Court has found that the land in question where the alleged contract [for sale of the RISE building] was "fee land within the reservation." There is no evidence submitted with the complaint pleading, nor is it alleged in the complaint, that the contract was entered into by the parties [i.e., the Tribe, Knighton and RISE] within the reservation, or on fee lands within the reservation. Under federal law, the Cedarville Rancheria Tribal Administration building is fee land outside the reservation at present, and is now owned by the Tribe.

1    Tribal Court Order Granting RISE's Mot. to Dismiss (Dkt. No. 1-3 at 48).  The Tribal
2    Court went on to note that, with respect to RISE, the Tribe's complaint "fails to allege the
3    condition precedent of the location of [RISE's tortious] activity within the boundaries of
4    the reservation, and the timing of the same activity being concurrent with R.I.S.E.'s
5    alleged tortious conduct."  *Id*. (Dkt. No. 1-3 at 49).  It subsequently confirmed the fee
6    status of the tribal headquarters land in June 2016, noting that the Tribe "is in the process
7    of seeking fee-to-trust status of the land on which the Tribal headquarters sit."  Tribal
8    Court Order Denying Knighton's Mot. to Dismiss Under Rule 19 (Dkt. No. 1-3 at 61).
9         This record demonstrates that Knighton's activities in question did not occur on non-Indian
10   fee lands within the Tribe's reservation, and thus under *Water Wheel*, the *Montana* exceptions do
11   not apply.[19]  *See Water Wheel*, 642 F.3d at 810.  Rather, I must return to the basic jurisdictional
12   analysis and assess whether the Tribe has authority to regulate Knighton's activities during her
13   tribal employment—all of which occurred on land owned by the Tribe, whether on the reservation
14   or at the fee-owned Tribal Headquarters building.

15                    **2.     Tribal Regulatory Authority**
16        A tribe's regulatory authority over nonmembers must derive "from the tribe's inherent
17   sovereign authority to set conditions on entry, preserve self-government, or control internal
18   relations."  *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008).  A
19   "tribe is able fully to vindicate its sovereign interests in protecting its members and preserving
20   tribal self-government by regulating nonmember activity on the land, within the limits set forth in
21   [Supreme Court] cases."  *Id*. at 336 (emphasis omitted); *see Merrion v. Jicarilla Apache Tribe*,
22   455 U.S. 130, 144 (1982) (finding that the power to exclude nonmembers from reservation trust
23   lands "necessarily includes the lesser power to place conditions on entry, on continued presence,

---

[19] Although the Ninth Circuit has made clear that *Montana* does not govern the circumstances in this case, *see Water Wheel*, 642 F.3d 802, if *Montana* did apply, I agree with the Tribal Court that the Tribe would have subject matter jurisdiction under both exceptions.  *See, e.g.*, *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 2013 WL 321884, at *12–15 (D. Ariz. Jan. 28, 2013)(finding Tribe had jurisdiction over nonmember defendant on Tribal land).

14

or on reservation conduct."). To the extent a nonmember's activities "may intrude on the internal relations of the tribe or threaten tribal self-rule," such activities may be regulated. *Plains Commerce*, 554 U.S. at 335.

Knighton explicitly acknowledges in her complaint that the Tribe has regulatory authority over its employees and their conduct: "At the time of Knighton's employment, the Tribe regulated its employees" and "[Knighton] is subject to the regulatory procedures that existed at the time of her employment." Compl. ¶¶ 18–19, 51. These admissions alone establish the Tribe's regulatory authority over Knighton's employment.

Furthermore, as Tribal Administrator, Knighton directly immersed herself in, and had considerable oversight of, nearly all aspects of the Tribe's day-to-day government. She was "responsible for over-all supervision and management of the Cedarville Rancheria, including contract negotiations, wages, and compliance; and supervision of employees according to the salaried job description." *Id*. ¶ 18; Cedarville Rancheria Policies (Dkt. No. 1-2 at 26). Her other job duties included "[p]lanning, development, management, and supervision of all projects contracted by Cedarville Rancheria;" meeting with government agencies and other tribal offices on behalf of the Tribe; "[r]eporting to the Tribal Council (Board) and all funding agencies on a timely and regular basis"; and managing "payroll, taxes, and expenses, financial statements/reports for audit, expenditures, and ledgers under direct supervision of the Chairperson." *Id*. She also had significant discretion in hiring, disciplining, and terminating tribal employees, both members and nonmembers. *Id*. Knighton's employment activities directly affected the Tribe's inherent powers to protect the welfare of its members and preserve the integrity of its government.

The Tribe's sovereign interest in ensuring its economic survival further supports its regulatory jurisdiction here. During her tenure as Tribal Administrator, Knighton was extensively involved in the Tribe's finances and was responsible for the Tribe's "payroll, taxes, and expenses, financial statements/reports for audit, expenditures, and ledgers under direct supervision of the Chairperson." *Id*. The Tribe alleges that Knighton's actions as Tribal Administrator had a devastating effect on the Tribe's economic wellbeing. Considering the small size of the Tribe's membership, her conduct threatened the Tribe's very economic survival.

The Tribe's regulatory jurisdiction over Knighton's on-reservation activities as Tribal Administrator is unassailable. Not only does Knighton concede that the Tribe has authority to regulate her employment, but her alleged activities on the Rancheria directly interfered with the Tribe's sovereign powers to control internal relations and protect the welfare of its members.

### 3. Tribal Adjudicative Authority

"Where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." *Strate*, 520 U.S. at 453 (citation and brackets omitted). However, a tribe's adjudicative authority over nonmembers may not exceed its regulatory authority. *Id*. at 438. In *Water Wheel*, after concluding that the tribe had regulatory jurisdiction over nonmembers for trespass on reservation trust land, the Ninth Circuit determined that adjudicative authority also existed. 642 F.3d at 816. Factors that supported a finding of adjudicative jurisdiction included "the important sovereign interests at stake [i.e., inherent power to exclude nonmembers and manage reservations lands], the existence of regulatory jurisdiction, and long-standing Indian law principles recognizing tribal sovereignty." *Id.* The circumstances here present an even more compelling basis for adjudicative jurisdiction than those in *Water Wheel*—Knighton was a longtime employee of the Tribe who was entrusted with the responsibility of overseeing all aspects of tribal operations.

Knighton's due process argument, that "because the Tribal Court did not exist at the time of her employment, [the] Tribe is exceeding its authority to regulate her employment through ex post facto application of its tribal judicial system," is unconvincing. Opp'n at 8 (Dkt. No. 14). The Tribe is not attempting to "create new regulations and impose them on Knighton ex post facto" as she alleges; Knighton's alleged conduct violated the Tribe's regulations that were in place—and that she wrote—during her employment with the Tribe. *Id*. at 9; *see* Compl. ¶¶ 20–22. The Tribe is simply seeking to adjudicate its claims against her in its chosen forum—the Tribal Court. Knighton's assertion that "any dispute between [her] and the Tribe is subject to the regulatory procedures that existed at the time of employment, *to wit*.: the disciplinary and grievance procedures enumerated in … the Tribe's Personnel Policy and Procedure Manual" is simiilarly unpersuasive. Compl. ¶ 51. Defendants correctly note that the "Tribe's Administrative

Policies and Procedures confer jurisdiction not only to the Tribe, but more importantly, to the Tribal Council [which is comprised of the Tribe's adult voting membership] in cases where the Tribal Administrator is the focus of discipline." Mot. at 8 (Dkt. No. 10). Even if the Tribal Court did not presently exist, then the Tribal Council would have jurisdiction over the claims at issue.[20] Cedarville Rancheria Policies (Dkt. No. 1-2 at 40). Moreover, the Tribe's constitution, adopted in 2011, provides that the "jurisdiction of [the Tribe] shall extend to the land now within the confines of the Cedarville Rancheria and to such other lands as may hereafter be added thereto." Cedarville Rancheria Constitution and Bylaws (Dkt. No. 1-2 at 45).

Because the Tribe has both regulatory and adjudicative jurisdiction over Knighton, the Tribal Court has subject matter jurisdiction over the underlying action.

## II. FAILURE TO JOIN INDISPENSABLE PARTY

Defendants argue that "[w]hether non-party R.I.S.E. is an indispensable party has no bearing on Defendants' motion to dismiss," because "the threshold question" is whether the Tribal Court has jurisdiction over the underlying action. Reply at 8 (Dkt. No. 15). I agree. And Knighton seemingly concedes that the two issues are unrelated: " the arguments in [defendants'] Motion to Dismiss are limited to the former issue of subject-matter jurisdiction and do not address the latter issue of joinder of RISE… ." Opp'n at 13. But my precise task must be limited to the question of the Tribal Court's jurisdiction. Knighton has submitted no authority establishing that the Tribal Court's lack of jurisdiction over *RISE* divests it of jurisdiction over the *action*. Because the Tribal Court has jurisdiction over the underlying action pending against Knighton, I do not address Knighton's indispensable party argument.

As a separate and independent reason for denying Knighton's indispensable party argument, she has failed to exhaust her tribal remedies. Although the Tribal Court certified as ripe

---

[20] An appeal hearing would be "subject to the control of the [Tribal] Council," which had the power to "vary the procedure" of an appeal hearing, and the Tribal Council's decision following an appeal hearing would be final. Dkt. No. 1-2 at 40-41. The Personnel Manual also provides that "[t]he specific type and degree of disciplinary action will be determined by the nature of the offense," which leaves the door open for additional disciplinary actions to be utilized. Dkt. No. 1-2 at 33.

for federal review "the question of jurisdiction over Defendant Knighton, as this question has already been appealed to the Cedarville Rancheria Court of Appeals," it expressly noted that "tribal processes as to only [the jurisdiction] issue, *and no other issues*, have been exhausted by the parties." Dkt. No. 1-3 at 62. *See Nat'l Farmers Union*, 471 U.S. at 856 ("[T]he orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.").

## CONCLUSION

Given the Tribal Court's jurisdiction over the underlying action, defendants' motion to dismiss is GRANTED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: February 15, 2017

William H. Orrick
United States District Judge